[842 NYS2d 395]

JEFFREY P. TUNICK, Appellant-Respondent, v LARRY SHAW et al., Respondents, and EDITH SHAW MARCUS et al., Respondents-Appellants.

First Department, September 13, 2007

### APPEARANCES OF COUNSEL

*Michael J. Marino*, Nyack, for appellant-respondent.

*Jeffrey P. Tunick*, appellant-respondent pro se.

*Marcus & Greben*, New York City (*David M. Marcus* of counsel), for Edith Shaw Marcus and others, respondents-appellants.

*William S. Greenawalt*, White Plains, respondent-appellant pro se.

### OPINION OF THE COURT

BUCKLEY, J.

Over the course of his photographic career, Sam Shaw took thousands of pictures of celebrities, including the famous photograph of Marilyn Monroe with her skirt blowing upward. In 1994, he commenced an action against his son Larry, also a

photographer, for conversion of over 200,000 commercially valuable photographic images and related claims, and sought a declaration of ownership rights, an accounting of the images, unspecified compensatory damages, and $100 million in punitive damages (the Shaw family action). Larry, contending that Sam had gifted or assigned rights in the photographs to him, and that he, not Sam, had shot some of them, raised 10 counterclaims. In 1995, Supreme Court dismissed several of the counterclaims, but in 1998 granted Larry the right to examine all 500,000 photographs in Sam's possession.

Upon Sam's death in April 1999, Supreme Court appointed his daughters, Edith Shaw Marcus and Meta Shaw Stevens (collectively, the Shaw sisters), temporary administrators to prosecute the action against Larry, and appointed a receiver of the 500,000 photographs that had been in Sam's possession. The receiver stored the photographs in a warehouse, where they were damaged. The receiver filed a $2 million claim with the insurer, which filed for bankruptcy protection; the claim was turned over to the New York State Liquidation Bureau and assigned to an adjuster, but remains unresolved.

In 2002, after eight years of hearings, motions, appeals, stays, and spin-off actions, the Shaw family action was settled, pursuant to which the Shaw Family Archives, Ltd., was created to take possession and ownership of the 500,000 photographic images that had been in Sam's possession, plus an additional 200,000 images that had been in Larry's possession. Larry became a 50% owner of that entity and any agency and marketing rights, and each of the Shaw sisters became a 25% owner.

Jeffrey P. Tunick represented Larry in the Shaw family action from its inception, under a written retainer agreement at the rate of $200 per hour.

Pursuant to a written retainer agreement dated September 13, 2000, William S. Greenawalt undertook representation of the Shaw sisters at an hourly rate of $300, but double that rate if he

> "obtain[ed] some or all of the contested photos, negatives, transparencies or images (collectively 'images') which constitute part of [certain specified collections] and any other collection or set of images as to which Larry Shaw is claiming ownership or will not yield possession, or if [the Shaw sisters] obtain[ed] monies from Larry Shaw, some of the marketing and commercial exploitation rights to the

images of Marilyn Monroe, or some or all of the missing Marilyn Monroe images, or if a substantial portion of [certain specified images] held by Larry Shaw [is] recovered."

More than a year after the settlement of the Shaw family action, Tunick commenced this special proceeding to fix his charging lien, pursuant to Judiciary Law § 475, in the amount of $557,505.77, and to attach the lien to the 700,000 photographs and any insurance proceeds settling the storage claim. Greenawalt cross-petitioned to fix his charging lien in the amount of $1,066,294, representing the double fee rate set forth in his retainer agreement.

█ Although the disputed photographic images themselves were in existence before the professional involvement of Tunick and Greenawalt, the efforts of the attorneys in pursuing their respective clients' claims and counterclaims culminated in the settlement resolving conflicting rights to the possession and commercial exploitation of those images, and the obtaining of an interest for their clients in hundreds of thousands of additional images, as well as the creation of a single collection, and thus constitute proceeds from litigation upon which a Judiciary Law § 475 charging lien can affix (*see Petition of Rosenman & Colin*, 850 F2d 57, 61-63 [2d Cir 1988]; *cf. Chadbourne & Parke, LLP v AB Recur Finans*, 18 AD3d 222 [2005]).

The charging liens also attach to any insurance proceeds for damage to photographic images while in storage. The "enforcement of a charging lien is founded upon the equitable notion that the proceeds of a settlement are ultimately 'under the control of the court, and the parties within its jurisdiction, [and the court] will see that no injustice is done to its own officers' " (*Schneider, Kleinick, Weitz, Damashek & Shoot v City of New York*, 302 AD2d 183, 187 [2002], quoting *Rooney v Second Ave. R.R. Co.*, 18 NY 368, 369 [1858]). "The statute is remedial in character, and hence should be construed liberally in aid of the object sought by the legislature, which was to furnish security to attorneys by giving them a lien upon the subject of the action" (*Fischer-Hansen v Brooklyn Hgts. R.R. Co.*, 173 NY 492, 499 [1903]). The lien is imposed on the client's cause of action, in whatever form it may take during the course of litigation, and follows the proceeds, wherever they may be found (*see Matter of Cohen v Grainger, Tesoriero & Bell*, 81 NY2d 655, 658 [1993]).

"Moreover, the general rule is that a lien upon prop-

erty attaches to whatever the property is converted into and is not destroyed by changing the nature of the subject . . . It follows its subject and cannot be shaken off by a change of form or substance. It clings to any property or money into which the subject can be traced . . . ." (*Fischer-Hansen*, 173 NY at 501-502.)

The proceeds of the insurance claim for the damaged photographic images are the images in a different form, and therefore the charging liens attach to those insurance proceeds, even though the receiver, not Tunick or Greenawalt, has been prosecuting the insurance claim.

■ The amount of a charging lien can be predicated on an account stated without converting the special proceeding to fix a charging lien into an action for an account stated, where, as here, the attorneys are merely seeking to establish the amount of their liens, not an award of a judgment in the amount sought. In any event, it is unclear why Supreme Court deemed it inappropriate to convert the special proceeding into an action, by means of CPLR 103 (c), for the purpose of fixing the charging lien on an account stated. Indeed, it would be judicially uneconomical to require multiple actions and proceedings (*see Ferraioli v Ferraioli*, 8 AD3d 163 [2004], *lv denied* 3 NY3d 608 [2004]).

Larry Shaw never denied receipt of Tunick's bills and never protested the amounts, and therefore Tunick set forth an account stated in the amount of $557,505.77 (*see Morrison Cohen Singer & Weinstein, LLP v Waters*, 13 AD3d 51, 52 [2004]) and is entitled to a charging lien in that amount plus contractual interest. Where there is an account stated, it is unnecessary to separately establish the reasonableness of the fees (*see Cohen Tauber Spievak & Wagner, LLP v Alnwick*, 33 AD3d 562 [2006], *lv dismissed* 8 NY3d 840 [2007]).

Greenawalt, who did not send the Shaw sisters a bill until only a few weeks before his petition, failed to establish an account stated. In light of that failure, and the sisters' vigorous protests as to the number of hours billed and quality and efficacy of the services rendered, Supreme Court properly referred the issue of the reasonableness of his fees to a special referee. However, Greenawalt satisfied the conditions set forth in his retainer agreement justifying the doubling of his fee. The double fee provision was not ambiguous, and the record demonstrates that the Shaw sisters carefully negotiated and revised its terms.

Greenawalt did not oppose the request for return of images and documents used as exhibits in the Shaw family action, and therefore Supreme Court properly directed him to return them.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Emily Jane Goodman, J.), entered February 28, 2005, which, inter alia, granted Jeffrey P. Tunick, Esq. and William S. Greenawalt, Esq. charging liens pursuant to Judiciary Law § 475 for their attorneys' fees, imposed the liens against a collection of photographic images but not the proceeds of any insurance settlement relating to the collection, and referred the issue of the amount of the attorneys' liens to a special referee, and order, same court and Justice, entered on or about January 13, 2006, which granted reargument and adhered to its prior decision, should be modified, on the law, to attach the charging liens additionally to any insurance recovery related to the collection, vacate the reference with respect to Tunick's fees and fix his lien in the amount sought, and grant Greenawalt's request for a doubling of his fees as provided for in his retainer agreement, and otherwise affirmed, without costs.

Tom, J.P., Andrias, Nardelli and Williams, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered February 28, 2005, and order, same court, entered on or about January 13, 2006, modified, on the law, to attach the charging liens additionally to any insurance recovery related to the collection, vacate the reference with respect to Tunick's fees and fix his lien in the amount sought, and grant Greenawalt's request for a doubling of his fees as provided for in his retainer agreement, and otherwise affirmed, without costs.